Schenck v. Vail.

---

SCHENCK and others, appellants, and VAIL and others, respondents.

1. Under the sixth section of the statute of descents, the class of kinsmen who are next in degree of consanguinity to the intestate, take the land in exclusion of those who stand in a more remote degree.

2. By force of this section, the common law right of representation does not exist. So that first cousins take in preference to cousins of a more distant degree.

3. In calculating the degrees of consanguinity in this state, the civil and not the canon law rule is to be resorted to.

---

Doctor Henry Van Derveer, late of the township of Bedminster, in the county of Somerset, in this state, died on the 22d day of May, 1868, intestate. He never was married, and left, as his nearest of kin, five first cousins, who claim to be his heirs-at-law, and to whom his real estate descended, and in whose possession it has been since his death.

A bill for partition of the real estate whereof Doctor Van Derveer died siezed, was filed in the Court of Chancery on the 27th day of December, 1871. The parties complainant to said bill, are thirty-one second cousins and seven

Schenck *v.* Vail.

third cousins of the intestate. The parties defendant are the five first cousins aforesaid, thirty-eight second cousins, and sixty-four third cousins.

The lands of which the intestate died seized, as described and set forth in the bill, and which the complainants claim descended to them and the defendants in said bill named, and to which each is now seized of the part or share in said bill stated, consist of several tracts, embracing in the whole about eight hundred and ninety-three acres.

The complainants claim that they and the other second and third cousins of the said Henry Van Derveer, deceased, are entitled to certain undivided parts of the lands of which he died seized, according to their degrees of relationship to the said intestate; that is to say, the second cousins, whose father or mother was a first cousin of said Van Derveer, but dead before his decease, leaving them surviving the said second cousins, in said bill named, now claim, by said bill, to be entitled to have that portion of the lands of which said intestate died seized, to which their father or mother would have been entitled, if living at the time of said intestate's death, as first cousins and next of kin of said deceased; and the third cousins in said bill named, claim to be entitled to have their deceased father's or mother's portion of the said lands, which their grandparents would have inherited if living at the death of the said intestate.

The complainants admit that the five first cousins are each entitled to one twenty-seventh part, which in said bill is claimed to be one full share of said lands; and claim that said lands, on the death of said Van Derveer, descended to his first, second, and third cousins, as tenants in common, in the parts or shares stated in the bill, being one twenty-seventh part thereof, as aforesaid, to each of said first cousins living, and to the representatives of deceased first and second cousins; said representatives to take the share to which their respective ancestor (first or second cousin) would have been entitled if living at the time of the death of said Van Derveer; and that they are now seized of the said parts or

shares, &c.    (Here follow the several shares to which the several parties are alleged to be entitled.)

The bill prays a partition of the lands according to the respective rights and interests of the several parties thereto ; or, if that be impracticable, a sale of the lands and division of the proceeds.    It further prays the appointment of a receiver to take the rents, issues, and profits of the lands ; an account of such rents, issues, and profits as may have been received by the five first cousins during their possession and occupancy of said lands; and on their failure to pay over the same, that they may be deducted from their respective shares of the proceeds of the sale.

Demurrers to the bill were filed by all of the five first cousins.

The Chancellor adopted as his opinion in this case, the opinion in *Fidler* v. *Higgins,* 6 *C. E. Green* 138, and over-ruled the demurrers.

From the orders overruling the demurrers, appeals were taken to this court.

*Mr. Van Fleet, Mr. C. Parker,* and *Mr. Browning,* for appellants.

*Mr. F. T. Frelinghuysen* and *Mr. Williamson,* for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

In this cause, this court, for the first time, is called upon to express an opinion with respect to the meaning of the sixth clause of the act directing the descent of real estate. *Nix. Dig.* 236.

The controversy is urged between first, second and third cousins ; and the question is, whether they all stand, by force of the laws of this state, in the same degree in the line of heritable blood, or whether the class of first cousins is to be preferred to those more remote.    It will be observed that this

Schenck *v.* Vail.

is a problem which cannot, at all, be affected by the mere mode of computing the scale of relationship between these parties, because if such count be made by the rule of either the canon or the civil law, the result will be the same, and the cousins of the first degree will be found to be nearer of kin than those of the next or other remove.

And it is also obvious that although, as between these kinsmen, first cousins are nearest in blood to the deceased, nevertheless, at the common law, such propinquity would not have drawn the inheritance to them exclusively. The cousins in the second and those in the third degree would have taken, *per stirpes*, the share to which their ancestor would have been entitled if he had survived. The rule that when the estate descended upon collaterals, the lineal descendants, *in infinitum*, of any of such collaterals as were deceased, should represent such deceased, is an admitted principle of the common law. Waiving the effect of those canons which relate to primogeniture and the preferment of the male stocks, all these claimants would indisputably have stood on the same level under the operation of that system. As, therefore, that system was transplanted, together with the body of the common law, into this state, and prevailed here, in full vigor, until the year 1780, the only question now arising is, whether it has been abolished so far as respects the particular in question. Has the statute of this state taken away the right of representation among collaterals? The Chancellor, in the learned and very instructive opinion which has been sent up to this court with this case, answers this inquiry in the negative. The opinion thus referred to was read in the case of *Fidler* v. *Higgins*, reported in 6 *C. E. Green* 138, and the Chancellor has directed that it should stand as the expression of his views on the present occasion. The result thus declared is to the effect that among collaterals, the right of representation inheres in the estate, under our statute, as it did at common law. The correctness of this judgment is the immediate subject of inquiry.

The investigation relates to the proper interpretation of

the sixth section of our statute of descents. It is in the words following, viz. : " When any person shall die seized of any lands, tenements, or hereditaments, as aforesaid, without devising the same in due form of law, and without lawful issue, and without leaving a brother or sister of the whole or half blood, or the issue of any such brother or sister, and without leaving a father or mother capable of inheriting by this act the said lands, &c. ; and shall leave several persons, all of equal degree of consanguinity to the person so seized, the said lands shall then descend and go to the said several persons of equal degree of consanguinity to the person so seized, as tenants in common, in equal parts, however remote from the person so seized the common degree of consanguinity may be," &c.

The legislative endeavor in this passage is plain. It is to designate the class of persons who are to take the land on the contingency specified. The terms used, considered intrinsically, are explicit and perfectly intelligible. Accepting them in their ordinary and natural meaning, the expression, " several persons, all of equal degree of consanguinity" to a deceased person, admits of but a single interpretation ; the words, *ex vi terminorum,* exclude all those who do not stand in the same degree of blood, and in their usual import they utterly refuse to comprehend, in the same category, both first and second cousins.

But the argument is, that the natural status of the persons indicated is not intended by this description, but that it regards the legal artificial status. The reasoning is this : That the rules of the common law cannot be abolished except by an expressed intention or a necessary implication ; that the doctrine of indefinite lineal representation is one of the inherent qualities of that system, and that there is nothing apparent in this sixth section which looks to its abolition ; and that by force of the operation of this doctrine, the issue of a decedent who belonged to any given class of heirs, will stand, as one of such class, as the representatives of such decedent.

Schenck v. Vail.

The contention, I think, is entirely novel. This clause of the statute has stood in its present form for nearly half a century, and yet I am not aware that there is any ground to suppose that this explanation of it was ever suggested until the case already named, of Fidler v. Higgins. And even then the hypothesis was not broached by counsel on the argument, but is presented, seemingly for the first time, in the opinion of the court. And it is to be observed that the effect of this proposed construction is quite radical ; it leaves no room for hesitation as to the mode by which the question of the heirship is to be solved. Every practitioner is aware, that ever since the passage of this statute, a doubt more or less strong has occasionally occurred to the mind of some gentleman of the profession, whether, among collaterals, the degrees of consanguinity were to be calculated by the rule of the canon or by that of the civil law. This question has never been settled by final adjudication, and there are few of the older members of the profession who have not examined the subject, and expressed opinions with respect to it. And in the discussion which took place in the present case, the written views on this point, of the most distinguished counsel, were laid before the court. But if this act is to be read in this hidden sense, now for the first time revealed, it is manifest that this search after the true rule of computation was a mere illusion or idle speculation, for under the efficacy of the principle of infinite representation, both rules lead to the same result. When the controversy was between a living uncle of the deceased and the son of a deceased uncle, it was not worth while to struggle the point whether the degrees of blood were to be ascertained by the measure of the canonists or of the civilians, if, in legal theory, the son of such uncle represented and stood in the place of his deceased parent. No one can doubt that the suggested view must supersede all old notions on this subject, and that it entirely escaped the acumen of that large body of eminent jurists who were cotemporary with this law. Under such circumstances, I cannot but think that the novelty of this construc-

tion is a strong argument against its soundness.    The general maxim is, that statutes are to be read in the ordinary sense of their terms, and when we know that, for this long period of time, this legislative expression has been commonly received as bearing a particular import, the most cogent reasons should appear to induce us to accept a different interpretation. This consideration seems to me of very great weight, but it is not, perhaps, absolutely conclusive, and as that recent construction comes from a source entitled to the highest respect, I shall proceed, but with as much brevity as practicable, to examine the language of the section in question, in the light of the purpose displayed in the other parts of the act.

I have said that the terms of this clause seem to me to be clear and perfectly intelligible.    The provision is, that in a certain designated juncture, where there are " several persons all of equal degree of consanguinity to the person" dying seized, " the said lands, &c., shall descend and go to the said several persons of equal degree of consanguinity," in equal parts.    This is a *designatio personarum*, and the persons described are made ascertainable by reference to the fact of their occupying a place in the same line in the gradation of descent from their ancestor.    They are all required to be in equal degree of consanguinity.    But it is said the more distant relative is made equal in degree of blood with the nearer relative by the doctrine of representation.    This mode of expressing their right is not correct.    By representation, the descendant was not elevated in point of degree of kindred to the place of his ancestor.    On the contrary, instead of taking because he was of the same degree of relationship as his ancestor was, he took, in the language of the books, *jure representationis*, and because he could not claim *jure propinquitatis*.    The right of representation is founded on the fact, that the representative is not of the same degree of consanguinity that the person represented was.    The fact is, this doctrine of representation never has had, and never can have any place in a description of a class of persons standing in a degree of consanguinity.    No common law writer ever

described the son and the grandson as being in the same degree of blood to the father. Invariably, the one is said to be in the first degree, and the other in the second degree; and yet, in case of the death of the former, he is represented by the latter. In point of heritable right, second cousins, at the common law, were on a par with first cousins, but to aver that, as a matter of description, they can be said to be in the same degree of blood, is, as it seems to me, a plain abuse and confusion of language. The terms used in this section of this act have always had a fixed and certain import: why are they now to receive a highly artificial and conjectural meaning? The proposed construction is ingenious, but its defect is, that it is in opposition to every word in the clause. I think this legislative language should be still permitted to bear the meaning which it has always heretofore been supposed to bear. In such cases, a novelty is almost invariably an error.

And there is, also, a further incongruity. The statute calls for a distribution in equal parts between " said several persons." The proposed doctrine requires a division partly between persons and partly between stocks. The inheritance is to go, it is now insisted, in part *per capita* and in part *per stirpes*. But how does this fulfill the statutory requirement of an equal division among persons? If the estate be divided into three equal parts, two of them going distributively to two first cousins, and the third passing to the three children of a deceased first cousin, can it be said, with the least propriety of speech, that this is a division between several persons in equal parts? To dispense the property evenly between a number, some taking severally, and others, as a class, taking a single share jointly, would be an equal division; but, just as certainly, it would not be an equal division among individuals. This plain direction of the statute cannot be rejected. Nor do I perceive how here there is any room for implication, as there is in the language found in the statute of distributions. In that act the residue is ordered to be divided " amongst the children," and such persons " as

legally represent such children, in case any of said children be then dead." Two classes are thus referred to, and in one of them representation is to take place, and in view of such directions, I think it obvious a fair question arises whether the distribution is to be throughout *per capita*, or in part by stocks. It is a case for construction. But when the regulation is to divide the property equally between several persons who are clearly designated, then the office of the court is one simply of interpretation, and all implications are out of place.

Nor does it appear to me that the construction which is the subject of criticism, is in nearer accord with the general spirit and purpose of the statute, than it is with the phraseology of the particular section already considered. As soon as we open this act, we at once perceive that the subject of representation, in the course of descents, has been regulated with care. The entire history of this branch of our statutory law shows manifestly, that this feature in the system has received the attention of successive legislatures. In section one, of the present statute, the doctrine is retained and defined in case of the inheritance descending on the issue of the deceased; so, in section two, when it falls to the brothers and sisters, and in like manner, in a subsequent clause, if the half blood inherit. Thus we find in every instance in which the estate is given to a class of persons, express provision is made for representation. Why was such provision omitted in the sixth clause? If it was necessary to call it into life, and to regulate it in the case of lineal descent, it seems undeniable that the same necessity existed with respect to collateral descent. In the direct line the estate does not descend by representation, as at common law, but it descends divested of the incidents of primogeniture, and the preference of the male over the female stocks. This result is produced by the express enactment of the law. The question recurs, why has the sixth section nothing to say on this subject? It would seem difficult to present a more appropriate case for the application of the maxim, *expressio unius est exclusio alterius*. The entire structure of this act seems to lead irresistibly to the

Schenck *v.* Vail.

conclusion, that it was the legislative design to exclude from the class of instances embraced in this particular clause, the whole doctrine of representation, either as it existed at common law, or as it is modified in the previous sections. Nor is such supposition unreasonable in itself. Such exclusion of the rule in this connection tends, I think, very decidedly in the direction of a sound policy. It harmonizes with the rule of law which circumscribes, within reasonable bounds, the right of representation in the distribution of personalty. It prevents titles to realty from becoming uncertain and intricate, by reason of the vast multiplication of owners. In the present case, the claimants are one hundred and thirty-nine in number, and the subdivision of the land would be so enormous that if the property in dispute had consisted of but a few acres of ordinary value, the shares of some of these litigants would have to be awarded to them, not in dollars, but in pennies. Such an illimitable dispersion of the title to inheritable land has not, as far as I am informed, been sanctioned by the laws of any country. Certainly, in the English law there is no type of such a principle. In that system, when lands passed by inheritance to a class, such as females, the subdivision of the estate in its devolution under the right of representation, was checked and thwarted by the concomitants of primogeniture and the superiority of the males. By the counteraction of such forces, the descending title was inevitably confined within a few channels. These considerations lead me to think that it was not unwise to throw out altogether the doctrine of representation among collaterals. If admitted at all, it would be tolerable only under narrow restrictions. But as I have already remarked, the language of this section is utterly incompatible with the admission of the doctrine in any of its forms, and thus all speculation on the subject is useless.

With respect to the second point discussed upon the argument:

In the year 1859, Chief Justice Green, sitting in the Hunterdon circuit, upon an application for a partition of lands,

decided that the civil law rule was the proper one to be employed in calculating descents in this state. That controversy was between uncles and aunts on the one side, and the children of deceased uncles and aunts on the other, so that this ruling was on a point vital to the case. It is stated by one of the counsel concerned in that litigation, that when this question was mooted the Chief Justice expressed surprise that any lawyer should be in doubt on the subject. This opinion was inserted by Judge Elmer in the digest of our laws, in the edition of 1861, p. 215, and no one can doubt that such publication was an endorsement of the view thus expressed. It is unnecessary for me to say that more satisfactory witnesses as to the point in question,.than these two eminent and experienced jurists, could not be adduced. Counsel, during the argument of the present case, adverted to or read a number of other opinions on this subject, written at various times, by different gentlemen of figure in the profession, expressive of a similar view. And among these *responsa prudentum* was one bearing the weighty signature of the late General Wall. That opinion, which had received the approval of Mr. J. Warren Scott, bore date February 26th, 1835. In addition to these, and other attestations of the same character, the attention of the court was turned to the practical construction put upon the law in question in the devolution of the large estate of Joseph Ball, who died in the year 1821, seized of the Weymouth Furnace Tract, in the county of Gloucester, said to contain sixty thousand acres. This decedent left an uncle and an aunt, and numerous cousins, the children of deceased uncles and aunts. Under the opinion of General Wall and those of other counsel of high standing, the uncle and aunt took possession of the estate and it remained with them and their heirs exclusively, and without question, for nearly forty years. This example is peculiarly significant from the circumstance that it occurred within four years after the passage of the sixth section of the act in question. It is certainly improbable, in the highest degree, that this large property would have been suffered to

pass without challenge or litigation to these two relatives, in exclusion of those who by the canon law were clearly co-heirs, if any serious doubt had existed in the minds of cotemporary lawyers as to which rule of calculation was appropriate.　In the case of *Taylor* v. *Bray,* 3 *Vroom* 191, in the opinion read by me, the conviction was expressed that although there had formerly been some hesitation on the subject, the sentiments of the legal profession had become settled in favor of the applicability of the rule of the civil law.　It is true that the question was not of vital importance in the decision of that case, but it nevertheless received some consideration from all of the judges who sat on that occasion and there was no difference of sentiment with respect to the matter.　From the inquiries then and subsequently made by me, as to the state of professional opinion upon this subject, and from my own experience as a practitioner, I am thoroughly satisfied that in the vast majority of instances lands have descended in this state, since the enactment of the sixth section of the act under consideration, in accordance with the civil law calculation of the degrees of descents. Indeed I have never seen nor heard of a written opinion of any lawyer expressing any other view, prior to the case of Fidler *v.* Higgins.　The old bar seem to have been unanimous on the subject; it is in the minds of a younger race of lawyers that doubts appear to have arisen.　Under such circumstances it appears to me that this question ought to be considered settled by cotemporaneous and long continued construction.　Titles to property ought not to be jeoparded or destroyed, after such an acquiesence, by the promulgation of new judicial ideas.

Nor do I see such prevalent weight in the argument, so strenuously urged by counsel on our attention, that the canon law rule is the rule of the common law, and that as such it cannot be discarded in this state except by the aid of the legislature.　In the first place, it may well be questioned whether the assumption upon which such argument is based is well founded.　The rule of the canon law has, indeed, the

sanction of Sir William Blackstone, but the authority he vouches for his opinion does not entirely sustain it, and other writers of equal learning have expressed a view opposite to this of the great commentator.    It is certain that the adoption of either rule was a matter of indifference under the English system, in which ·prevailed the doctrine of the representation of the ancestor by his lineal descendants.    This was so completely the case, that Mr. Christian is enabled to say that " the introduction of the computation of kindred, either by the canon or the civil law, into a treatise upon descents may perplex, but can never assist."    And on another occasion the same writer remarks: " *It is said* that the canon law computation has been adopted by the law of England; yet I do not know a single instance in which we have occasion to refer to it."    2 *Black. Com.* 208, note 10, (*Am. Ed. of* 1830); 2 *Black. Com.* 224.    It can hardly be said that a dogma, which has no practical efficiency, exists as a part of any system of laws.    It has certainly never been impressed with the stamp of judicial approval.    But aside from this question, when the statute of this state was enacted, remodeling the entire plan of descents, and leaving scarcely a vestige of that of the common law remaining, it did not follow that the rule of the canon law, even if such rule had been transplanted into the ancient English system, was to be necessarily applied by the courts of this state, to this new condition of things.    The change was so great and radical that it plainly amounted very nearly to an utter abolition of the old system. Under such altered conditions, no rule derived from the old scheme could possibly be appropriate or admissible, that was not in harmony with the new scheme.    The whole subject was resolved into a question of legislative intent, and it was in this scientific way that  the questions that arose were treated by cotemporary members of the legal profession.    The clear and obvious design of the statute, is to distribute the estate equally among those collaterals who shall stand in the same degree of blood to the person dying seized.    When this sixth clause refers to " persons of equal degrees of consan-

Schenck *v.* Vail.

guinity," it seems to mean persons who shall occupy that position as a matter of fact, and not by the application of an artificial rule. The test of heirship is made actual nearness of blood, and to such actual propinquity of blood, a preference is given. But the use of the canon law rule will frustrate this fundamental idea ; it is a rule of art, and will interfere with, and, in a measure, defeat the order of nature which the statute prescribes. When an uncle survives as the nearest of kin to the intestate, and ten nephews, the issue of a deceased uncle, also survive, it is not within the meaning of the statutory terms, that such uncle and his ten nephews are each to take the one-eleventh part of the property. But such is the result by the admission of the rule of the canonists. On the contrary, the rule of the civil law is the natural rule ; it always selects as the heirs, those who, in the words of the act, are " in equal degree of consanguinity," and thus perfectly effectuates the purpose of the law maker. When the choice was between an old rule that ran counter to the new system, and another rule, which was every way fitted to carry it into effect, it is not to be wondered at that the former was rejected. In such rejection my judgment fully concurs. It was doubtless in this way that the rule in question came so much in vogue, that Chancellor Kent felt warranted in saying that it was the rule in general use in this country. But whatever doubts might arise if this question were *res nova,* I think they must be considered effectually dispelled by the ancient and persistent opinion of the legal profession on this subject, and which has been, for such a series of years, almost universally acted upon.

Before concluding, it should be stated that when the case of *Lerch* v. *Oberly, 3 C. E. Green* 575, was before this court, the circumstance that the question here discussed was involved, entirely escaped observation. The only point argued or decided, was whether the money into which the land had been converted was to devolve as real estate or as personalty. The relationship of the parties who          n-ants did not attract attention.

In my opinion, the decree in the present case should be reversed.

I have the authority of the court to state that on both points stated and discussed in the foregoing opinion, the judges of the court are unanimous in favor of the conclusions above expressed.

Decree unanimously reversed.